McLean, Justice,
 

 delivered the opinion of the court. — This suit was brought into this court from the supreme court of the state of Missouri, by a writ of error. An action for false imprisonment was commenced in the circuit court for the county of St. Louis, by the defendant in error, to establish her freedom. By the consent of counsel, under the statute of Missouri, the facts and law of the case were submitted to the court. The facts, as stated in the bill of exceptions, are these :
 

 The mother of Aspasia was born at Kaskaskia, Illinois, previous to the year 1787, and was held as a slave, from her birth, by a citizen of that country. His residence commenced before the country was conquered by Virginia, and continued until after the birth of Aspasia ; which was several years subsequent to the passage of the ordinance for the government of the north-western territory. She was born a slave, at the village of Kaskaskia, .. and held as such. In the year 1821, she *was purchased by the plain- -* tiff in error ; who immediately afterwards gave her to his son-in-law, Francis Chouteau, a resident of St. Louis. He held her as a slave, until October 1827, when he returned her to the plaintiff in error, in consequence of the claim she set up for her freedom.
 

 Upon this evidence, Menard claimed Aspasia as his slave; but the circuit court decided against him. He appealed to the supreme court of the state ; and in that court, the judgment of the circuit court was affirmed. To reverse this judgment, a writ of error is now prosecuted, and two errors are assigned. 1. Slaves in the north-western territory, before and at the time of the adoption of the ordinance of 1787, were not liberated by that instrument, but continued slaves. 2. That the offspring of such slaves follow the condition of the mother, and are also slaves.
 

 To understand the nature of the right asserted by the plaintiff in error, a reference to the civil history of the Illinois country is necessary. By the treaty of peace, concluded in 1763, between England and France, the latter ceded to the former the country, out of a part of which the state of Illinois was formed. In the colonies of both France and England, it is well known, that slavery is tolerated. It was stipulated in the treaty, “ that those who chose to retain their lands, and become subjects of his majesty, the king of England, shall enjoy the same rights and privileges, the same security for their persons and effects, and liberty of trade, as the old subjects of the king.” The same assurance was given to the inhabitants of the country, in the proclamation of General Gage, in 1764. In 1778, a military force, organized under the authority of Virginia, and commanded by General Clarke, subdued Kaskaskia and post Vincent, and drove the British forces from the country. Soon after this occurrence, by an act of the Virginia legislature, a county called Illinois was organized, embracing the conquered district; and its citizens were admitted on an equality of rights with the other citizens of Virginia. This country was ceded to the United States
 
 *329
 
 by Virginia, in 1184, with certain stipulations, one of which was, that “ the French and Canadian inhabitants, and other settlers of the *Kaskaskias, St. Vincent’s, and the neighboring villages, who have professed <• d themselves citizens of Virginia, shall have their possessions and titles confirmed to them, and be protected in the enjoyment of their rights and liberties.” Under the laws of Virginia, the citizens of Illinois county had a right to purchase and hold slaves ; and that right was not abrogated, but protected by the cession of 1184, to the United States. In April 1184, congress passed certain resolutions, securing to the people north of the Ohio certain rights and privileges by which they were governed ; and which remained in force until the adoption of the ordinance of 1181. By these resolutions, the existence of slavery is not referred to, except by implication, in using the words,
 
 “
 
 free males, of full age,” being entitled to certain privileges ; and also, “ free inhabitants.” Under these resolutions, in the manner prescribed, the free inhabitants were authorized to adopt the laws of anyone of the original states. On the 13th July 1181, congress passed the ordinance for the government of the territory north-west of the river Ohio ; and repealed the resolutions of 1184. In this ordinance, ten articles are adopted, which are declared to be articles of compact, “between the original states and the people and states in the said territory ; and to remain unalterable for ever, unless by common consent.” Among these articles, is the following : “ There shall be neither slavery nor involuntary servitude in the said territory, otherwise than in the punishment of crimes, whereof the party shall have been duly convicted.”
 

 By an act of congress of 1189, and another of 1800, certain provisions were made to regulate the government of the territory, and make a division of it; but they do not affect the question which is made in the case under consideration. In the second section of the act of 1800, “theinhabitants of the territory shall be entitled to, and enjoy, all and singular the rights, privileges and advantages, granted and received by the said ordinance.” This provision was re-enacted in the act of 3d February 1809, which established the Illinois territory. By an act of congress of the 18th April 1818, the people *of the territory were authorized to form a constitution _ ^ and state government; and on the 3d December following, by a *• joint resolution of the senate and house of representatives, the state of Illinois was admitted into the Union, “ on an equal footing with the original states in all respects whatever.” The provision of the ordinance of 1181 prohibiting slavery was incorporated into the constitution. This provision of the ordinance, it is contended, could only operate prospectively ; and was never designed to impair vested rights ; that such was the construction uniformly given to it, under the territorial government; that the provision was understood to prohibit the introduction of slaves into the territory, by purchase or otherwise ; but those who were held in slavery at the time the ordinance was adopted, were not liberated by it.
 

 That this was the understanding of the people of the territory, at the time the constitution was adopted, it is argued, appears from the frequent reference made in that instrument, to “ free white male inhabitants,” in contradistinction from those who were not free ; and from a law which -was subsequently passed by the legislature of the state, imposing a taxon slaves. The rights of persons who claimed a property in slaves, it is urged, were not
 
 *330
 
 affected by the provisions of the ordinance of 1787, or of the constitution ; but remain as they were, prior to the adoption of either. That a construction, different from this, would be destructive of those rights which the citizens of the country' enjoyed under the French and British governments, and which were guarantied by Virginia, and provided for in her ce sion of the country to the Union.
 

 The slavery of the mother of Aspasia being established, it is contended, that under the ordinance, her offspring must follow the same condition. This is, beyond dispute, the principle of the civil law ; and is recognised in Virginia, and other states, where slavery is tolerated. Whether the same principle be applicable to the case under consideration, is a question which it may not be necessary now to determine.
 

 The plaintiff in error insists on his right to the services of Aspasia as his slave, and attempts to enforce it. To try this right, the present aetion was instituted ; and a decision having been given against the right, the plaintiff al Prosecutes a *writ of error in this court to reverse the judgment. -* Can this court take jurisdiction of the case? By the 25th section of the judiciary act of 1789, it is provided, that “ a final judgment or decree, in any suit, in the highest court of law or equity of a state, in which a decision in the suit could be had, where is drawn in question the construction of any clause of the constitution, or of any treaty or statute of the United States ; and the decision is against the title, right, privilege, &c., under the statute, may be re-examined and reversed, or affirmed in this court.” Does the right asserted by the plaintiff in error come within any of the provisions of this section? Under what statute of the United States, is the right set up 9 The answer must be, under the ordinance of 17.87, and the statutes that have been subsequently enacted, which have a bearing on the question.
 

 In the second article of the compact contained in the ordinance, it is provided, that “ no man shall be deprived of his liberty or property, but by the judgment of his peers.” “And in the just preservation of rights and property, it is understood and declared, that no law ought ever to be made, or have force in the said territory, that shall in any manner affect private contracts.” This compact was formed between the original states and the people of the territory ; and that part of it which prohibits slavery is embodied in the constitution of Illinois. In thus being made a part of the fundamental law of the state, a guarantee against slavery, of as high obligation as on any other subjects embraced by the constitution, is given to the people of the state.
 

 There are various provisions in the compact which are'deeply interesting to the people of Illinois, and which, it is presumed, no one would contend, could give a supervising jurisdiction to this court. In the third article, it is provided, that “religion, morality and knowledge being necessary to good government, and the happiness of mankind, schools and the means of education, shall for ever be encouraged.” And in the third article, “that all fines shall be moderate, and no cruel or unusual punishment shall be *5151 “ -A-ll persons shall be bailable, *unless for capital offences, ‘ J where the proof shall be evident or the presumption great.” These, and other provisions, contained ‘in the compact, were designed to secure the rights of the people of the territory, as a basis of future legislation, and to have that moral and political influence that arises from a solemn recognition
 
 *331
 
 ol' principles, which lie at the foundation of our institutions. The same may be said as to. the provisions respecting the rights of property. The provisions in the compact which relate to “ property,” and to “ rights,” are general. They refer to no specific property or class of rights. It is impossible, therefore, judicially, to limit their application. If it were admitted, that Aspasia is the property of the plaintiff in error, and the court were to take jurisdiction of the case, under the provisions of the ordinance, must they not, on the same ground, interpose their jurisdiction in all other controversies respecting property which was acquired in the. north-western territory ? Whatever right may be claimed to have originated under the ordinance of 1787, it would seem, that a right to the involuntary service of an individual could not have had its source in that instrument. It declares, that “there shall be neither slavery nor involuntary servitude in the territory.” If this did not destroy a vested right in slaves, it, at least, did not create or strengthen that right.
 

 If the decision of the supreme court, of Missouri had been against Aspasia, it might have been contended, that the revising power of this court, under the 25th section of the judiciary act, could be exercised. In such a case, the decision would have been against the express provision of the ordinance, in favor of liberty ; and, on that ground, if that instrument could be considered, under the circumstances, as an act of congress, within the 25th section, the jurisdiction of this court would be unquestionable. But the decision was not against, but in favor of, the express provision of the ordinance. Was it opposed to any other part of the instrument ? It is possible, that opposing rights may arise out of the same instrument, although it contain no contradictory provisions. The right asserted by the plaintiff in error had not its origin under any express provision of the ordinance. It is only *contended, that that instrument did not destroy this right, which had its ■- commencement in other laws and compacts. A sanction of the right, implied more from the force of construction than the words used in the ordinance, is all that can be urged.
 

 No substantial ground of difference is perceived between the assertion of any other right to property, and that which is set up in the present case. The provisions of the ordinance will equally apply to every description of claim to property, personal or real. And if, from the general provisions respecting property, this court shall take jurisdiction in this case; on the same principle, it may revise the decisions of the supreme courts of Illinois, Indiana and Ohio; at least, in all cases which involve rights that existed under the territorial government. Give perpetuity to this general provision, and consider it as binding upon the people of these states, and it must have an important bearing upon their interests. Instead of looking to their constitutions as
 
 the
 
 fundamental law, they must look
 
 to
 
 the ordinance of 1787. In this instrument, their rights are defined, and their privileges guarantied. And, instead of finding an end of legal controversies respecting property, in the decisions of their own courts of judicature, they must look to this court. This cannot be the true construction of this instrument. Its general provisions, as to the rights of property, cannot give jurisdiction to this court. They do not come within the 25th section of the judiciary act. The complaint is not that property has been taken from the plaintiff ir. error, in the language of the ordinance,
 
 “
 
 without the judgment of his peers nor, that
 
 *332
 
 bis right has been affected by any law of the territory, or of the state. It is not pretended, that his right, whatever it may be, is not secured as fully under the constitution and laws of Illinois, as under the ordinance. In support of his claim, a reference is made to the judicial decisions of the state, under its own laws.
 

 If, then, a suit be brought by a citizen of Illinois to enforce a right in the courts of Missouri, which exists to as great an extent under the constitution and laws of the state of Illinois, as in the territorial government, under ^ the ordinance, and a ^decision be given against the right, can the -I party asserting it, ask the interposition of this court? The prosecution of this writ of error presents the question to this court, in the same point of view, as if the suit in Missouri had been commenced by the plaintiff in error. His title does not arise under an act of congress. This is essential to give jurisdiction, under this head. It is not enough to give jurisdiction, that the act of congress did not take away a right, which previously existed ; such an act cannot be said to give the right, though it may not destroy it. This suit must, therefore, be dismissed, as this court has no jurisdiction of the case.
 

 Writ of error dismissed.