OF THE

## STATE OF ILLINOIS,

DELIVERED

## AT THE DECEMBER TERM 1845,

AT SPRINGFIELD.

---

JOSEPH JARROT, *alias* PETE, *alias* JOSEPH, a colored man, plaintiff in error, *v.* JULIA JARROT, defendant in error.

*Error to St. Clair.*

An action of *assumpsit* for services rendered may be maintained by a colored man, and thereby try the question of his right to freedom.

The descendants of the slaves of the old French settlers, born since the adoption of the Ordinance of 1787, and before or since the Constitution of Illinois was adopted, cannot be held in slavery in this State.

Contemporaneous construction can have no place, where the intention is plain; it is only admissible in cases of doubtful construction.

ASSUMPSIT, by the plaintiff in error against the defendant in error, for work and labor, &c., brought in the St. Clair Circuit Court, and heard at the October term 1843, before

the Hon. James Shields and a jury. Verdict for the defendant and judgment for costs against the plaintiff.

The various proceedings in the case will appear in the Opinion of the Court.

*L. Trumbull,* and *W. H. Underwood,* for the plaintiff in error.

1. Where a party renders services for another under compulsion, the law will raise an implied promise to pay. Chitty on Contracts, 430.

In Kentucky and Missouri, trespass will lie by a slave against his master, who, knowing his freedom, retains him as a slave in his service. 4 Dana, 248; 1 Missouri, 476.

In this State, the negro may waive the tort and bring *assumpsit* for work and labor. *Kinney* v. *Cook,* 3 Scam. 233.

But it is said that this class of negroes have been, ever since the Ordinance, treated and regarded as slaves and taxed and sold as property by legislative authority. To this we reply in the language of this Court: "If a legislature have no power to pass an Act, any number of repetitions of an unconstitutional Act can never make the original Act valid. *Phœbe* v. *Jay,* Bre. 210.

2. The Ordinance of 1787 was passed by Congress avowedly for the purpose of "extending the fundamental principles of civil and religious liberty," and to fix and establish those principles as the basis of all laws, constitutions and governments, which *forever* thereafter should be formed in the North Western Territory. R. L. 55. Neither slavery nor involuntary servitude could exist under said Ordinance by its express provision. R. L. 57, Art. 6. That legislative authority can emancipate slaves has never been questioned. *The State* v. *Lasselle,* 1 Blackf. 61; 1 Dallas, 472; Law of Slavery, 346.

No clause in the Ordinance recognizes the right to hold slaves in the said Territory. Every reasonable construction is to be made in favor of liberty. 2 Black. Com. 97. An implied construction of a doubtful clause cannot be admitted to operate against the express letter of another part of a

legislative Act. 1 Dallas, 474. Nor can a special reservation be so enlarged by construction as to defeat a general provision. *The State* v. *Lasselle*, 1 Blackf. 62.

It has been decided in Mississippi, that the deed of cession from Virginia, of 1784, did not invalidate the provision in the Ordinance prohibiting slavery, and that all slaves in the North Western Territory became free by virtue of said Ordinance. Law of Slavery, 342, 346. A similar provision in the Constitution of Ohio has been construed in the same way by the Virginia Courts. Ib. 354. The same provision in the Indiana Constitution is construed in Indiana the same way. 1 Blackf. 62. A negro born in the North Western Territory since the Ordinance of 1787 is free, as decided in Louisiana and Missouri. Ib. 356; *Winny* v. *Whiteside*, 1 Missouri, 472, 726; *Menard* v. *Aspasia*, 5 Peters, 510.

The Act of the Territorial Legislature of 1807 in relation to registered and indentured servants was clearly a violation of the Ordinance of 1787, and consequently void. *Choisser* v. *Hargrave*, 1 Scam. 318; *Phœbe* v. *Jay*, Bre. 209.

The Ordinance is no doubt binding upon the people of this State, unless it has been abrogated by "common consent." That is, whenever the United States and the people of this State agree that the whole or any part of the Ordinance should be repealed, it will, as respects this State, become a dead letter. *Phœbe* v. *Jay*, Bre. 210; 1 McLean, 344.

The law of 1807 was made valid by our State Constitution. R. L. 44, § 3. No Legislative Act subsequent to 1787 could have made indentured servants bound to serve out their time, but a Constitution can. *Phœbe* v. *Jay*, Bre. 209. The fifth section of Art. 6, of our State Constitution, only made valid the Act of 1807, and left all persons free who were not by virtue of said Act. *Boon* v. *Juliet*, 1 Scam. 260. If the plaintiff was not a slave under the Ordinance of 1787, he could not be under our State Constitution. Art. 6, sec. 1, provides that neither slavery nor involuntary servitude should thereafter be introduced into this State, otherwise than for the punishment of crimes. R. L. 43. Art. 8,

sec. 1, of our State Constitution declares "that all men are born equally free and independent, and have certain inherent and indefeasible rights; among which are those of enjoying life and liberty," &c.

In Massachusetts it has been held, that "it would be difficult to select words more precisely adapted to the abolition of negro slavery," and entirely prohibits slavery. *Commonwealth* v. *Aves*, 18 Pick. 210. Did the framers of our Constitution, in the language of another, intend to keep the word of promise to the slave's ear and break it to his hopes? Did it intend to trifle with the justice and equity of the rights of the slave, and make their own fundamental law a mere phantom, which should elude the grasp of the philanthropist, and prove an idle and delusive dream? If words are not mere empty sounds, if they mean any thing, then the appellant is free, by virtue of this express declaration of our Constitution and the Ordinance of 1787. See, also, 3 Missouri, 272, which decides that this provision was designed "to prevent the relation of master and slave from existing in Illinois by an inhabitant and resident thereof."

*J. L. D. Morrison,* for the defendant in error, filed a written argument, which the present Reporter has been unable to obtain.

The Opinion of the Court was delivered by

SCATES, J. *Assumpsit* by the plaintiff against the defendant to try his right to freedom. *Non assumpsit* and issue. The defendant also filed seven special pleas, to which plaintiff severally demurred. The Court overruled the demurrer to the second, and sustained it to the rest. Issue to the country was joined upon the second plea, which stated in substance, that the plaintiff is the slave of the defendant by the laws of Illinois, and bound as such to render and perform for her such reasonable service as she may require, and which are the said services in the plaintiff's declaration mentioned and none other.

The plaintiff proved on the trial services to the amount of five

dollars, and rested.   The defendant proved Angelique, plaintiff's grandmother, was held as a slave at Cahokia in 1783, by one Joseph Trotier, and afterwards by one Lebrun, a son in law of Trotier; that Lebrun sold Angelique in 1798, and her daughter Pelagie then four years old, plaintiff's mother, to Nicholas Jarrot, of Cahokia; that Joseph Trotier was reputed to be an old French settler of Cahokia as early as 1769; that Angelique descended to his son, Augustus Trotier; that Nicholas Jarrot, by will dated Feb. 6, 1818, bequeathed to defendant all his personal property, including Pelagie, whom he held as a slave; that plaintiff is the son of Pelagie, born after the death of Nicholas Jarrot, and while his mother was so held as a slave by defendant; and that plaintiff was about twenty five or twenty six years of age.   To all this testimony the plaintiff objected at the time, and excepted to the opinion of the Court admitting it.   This was all the material evidence.

The Court instructed the jury at the defendant's request, that if they believed from the evidence, "that the plaintiff descended from Pelagie, a woman of color, and that said Pelagie, mother of the said plaintiff, descended from Angelique, a woman of color, who was held as a slave by one Trotier, who was an inhabitant of the Illinois country prior to the year 1783, and that the said plaintiff has come legally into the possession of the defendant, then the law is with the defendant, and the jury must find for the defendant." The jury found for the defendant.   The plaintiff moved for a new trial, which was refused, and excepted to, and the evidence embodied in a bill of exceptions.

The plaintiff assigns for error,—*first*, in admitting improper evidence; *second*, in instructing the jury contrary to law; and, *third*, in refusing a new trial.

The objection that has been taken and urged here by the defendant, that the plaintiff cannot in this form of action, try the question of his right to freedom, I do not think well taken. I know that it has been held, that where the plaintiff was purchased and held as a servant, that the law would imply an undertaking to pay for services so rendered.   *Livingston*

v. *Ackeston*, 5 Cowen, 531.   But I can see no well grounded
objection to such an implication, where the plaintiff is claimed
as a slave, for every one is presumed to know the law, and
whether, consequently, there can be any such thing as abso-
lute slavery in this State.   If there cannot be, it is but rea-
sonable to imply a promise to pay a *quantum meruit* for ser-
vices which are rendered to, and accepted by one having no
other pretext, to rebut the general presumption of promises
to pay for labor.

The record does not show when the plaintiff was born,
whether before or after the adoption of the State Constitu-
tion.   The only evidence from which we are to infer it, is,
that Nicholas Jarrot made his will on the sixth day of Feb-
ruary, 1818, giving plaintiff's mother to defendant, and that
plaintiff was born after his death, and while defendant held
his mother as a slave.   But it does not appear when Nicho-
las Jarrot died, and his will took effect, and defendant came
into possession; whether before August, 1818, or afterwards.
The trial below took place in 1843, and on the trial Vital Jar-
rot stated in evidence that plaintiff was twenty five, or twen-
ty six years of age, which would make 1817 or 1818 the year
of his birth.   The latter is the most probable, as the will
was made in February of that year, and he was not born un-
til his mother came into defendant's possession.   That might
have been before, or after the Constitution was adopted.   So,
it seems to me, that the question is legitimately presented by
this record, whether the descendants of the slaves of the old
French settlers of the Illinois country, born since the adop-
tion of the Ordinance and before the Constitution, or since
the Constitution, can be held in slavery in this State.   I shall
treat the question upon the whole ground, and for this pur-
pose will review shortly, the decisions of several of the States
upon these questions.   I remark, however, that if the ques-
tion of plaintiff's freedom was at all doubtful under the
Ordinance of 1787, the Court would, in favor of liberty,
infer that he was born since the adoption of the Constitu-
tion, in a case where the evidence leaves the fact doubtful.

This case differs from the case of *Phœbe* v. *Jay*, Bre. 210,

and *Borders* v. *Borders*, 4 Scam. 341, which were cases of indentures confirmed by the Constitution; and it differs also from the case of *Boon* v. *Juliet*, 1 Scam. 258, which was a case of the children of a registered servant, not included within the proviso to the third section of the sixth Article of the Constitution. But the defendant claims a right to hold the plaintiff in perpetual bondage, as a descendant of an old French slave held in bondage here before the Ordinance of 1787, notwithstanding it is declared by the Ordinance, that there shall be neither slavery, nor involuntary servitude in the North Western Territory, otherwise than in the punishment of crimes, &c.; and by the Constitution, that neither slavery nor involuntary servitude shall hereafter be introduced, except for like purposes; and to the extent of certain indentures and registrations theretofore made, and contracts of hiring for one year in the Saline boundary until 1825.

In recognizing and establishing the great and essential principles of liberty and free government, the Convention declared,—that all men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, and of acquiring, possessing, and protecting property and reputation, and of pursuing their own happiness. These principles and declarations of rights have not been applied to the cases that have heretofore arisen, because the Court were of opinion that other clauses of the Constitution applied to, fixed and controlled the condition of the person, except the case of Juliet's children, (1 Scam. 258, before cited,) where the humane and benign spirit of these principles recognized them as free. It is not pretended here that the Ordinance or Constitution have conferred this right to hold in bondage:—but it is denied that Congress or the Convention had the power to take away, or destroy this right of the old French settlers in this Territory, possessed by them at the time of its conquest by Virginia, and her cession of it to the United States.

I do not doubt but that the negroes possessed by the French settlers of the Kaskaskies and St. Vincents, while the Territory belonged to France, at its cession to Great Britain by the

treaty of 1763, and at its conquest by Virginia during the Revolution, were held by them in slavery. It is an institution created and introduced by, and dependent upon the municipal regulations of each particular Government; and although Great Britain and France would not tolerate it in those Kingdoms, they did, nevertheless, in their West Indian and American colonies, at that time and long afterwards. The traditions and histories of these settlements prove its existence in them. It is further evidenced and confirmed by an old edict of Louis XV. (see Law of Slavery, 374,) passed in 1723, authorizing it in the province of Louisiana, a copy of which has been preserved in the archives of Kaskaskia, as appears by an extract furnished by the defendant's counsel. But while I admit its existence in those settlements, I cannot doubt the power of any of the sovereignties, which have had, or that now have possession and jurisdiction over the Territory, to abolish it. Whatever may be said of the impolicy or injustice of such a deprivation, and invasion of the rights of property, the power cannot be denied. This question has been ably discussed by the Supreme Court of Mississippi, and the power also sustained by several other Courts. 14 Martin, 465; 1 McLean, 343; 6 Randolph, 566; 20 Martin, 699; Walker's Miss. R. 36; 1 Blackf. 60; see, also, 1 Black. Com. 160. Indeed, it is incompatible with our idea of sovereignty, if unrestrained by fundamental provisions in its form of organization, and contrary to all political writers on that subject. After the conquest of this Territory by Virginia, she ceded it to the United States, and stipulated that the "titles and possessions, rights and liberties" of the French settlers should be guarantied to them. This, it is contended, secures them in the possession of these negroes as slaves, and that neither Congress or the Convention had power to deprive them of it; or, in other words, that the Ordinance and Constitution should not be so interpreted and understood as applying to these slaves. Upon the correctness of this position depends the solution of this case. It is not one of first impression, as it has received the consideration and judgment of several Courts in different States. It has once been before this Court, and the decision of the Cir-

cuit Court against freedom was affirmed by an equal division of this Court.

In the case of the *Commonwealth* v. *Aves*, 18 Pick. 210, a slave belonging to a citizen of New Orleans, and attending her owner on a visit to Massachusetts, was held to become free under their Constitution which declares, that "all men are born free and equal, and have certain natural, essential, and inalienable rights, among which are the right of enjoying and defending their lives and liberties, that of acquiring, possessing and protecting property." A similar decision was made in the case of *Somerset*, the negro, 1 Black. Com. 425, note 3. Also, in the case of *Forbes* v. *Cochrane*, 2 Barn. & Cres. 448; 3 Dowl. & Ryl. 679.

In the case of *Merry* v. *Chexnaider*, 20 Martin, 699, it was held that the deed of cession by Virginia did not deprive Congress of the power to pass the sixth Article of the Ordinance of 1787; that this Ordinance fixed forever the character of the population over which it extended; and that a negro, born in the North West Territory since the Ordinance, is free.

In the case of *Harvey* v. *Decker*, Walker's Miss. R. 36, (Law of Slavery, 340,) the negroes were held as slaves in Virginia, and in 1784 were taken into the North West Territory, and kept near Vincennes until July, 1816. The Constitution of Indiana was adopted in June, 1816, and contained a provision like that in the Ordinance of 1787. It was held by the Court that these negroes were free.

In the case of *The State* v. *Lasselle*, 1 Blackf. 60, it appeared that the negro was the issue of a colored woman held by, and purchased of the Indians in the Territory previous to the treaty of Greenville and the cession of the country to the United States. It was held by the Court that she was free under the Constitution of Indiana, and that the Convention had the power to make such a Constitutional prohibition.

In the case of *Winny* v. *Whiteside*, 1 Missouri, 472, it was held that the negro woman, who had been taken into the Illinois Territory since the Ordinance of 1787 by her owners, who resided there four years, thereby became free, and upon

being taken afterwards to the State of Missouri, was not remitted again to a state of slavery, and that Congress, under the Confederation, had the power to pass the Ordinance.

In the case of *John Merry.* v. *Tiffin & Menard,* 1 Missouri,.725, the mother of the plaintiff had been held as a slave in Virginia and taken into the Illinois before the Ordinance of 1787, and held in slavery there before and after its passage, and the plaintiff was born there after the Ordinance. It was held that he was free.

In the case of *Menard* v. *Aspasia,* 5 Peters, 510, a similar opinion by the Court is strongly inferable. The facts were, that the mother of Aspasia was born in the Illinois previous to the Ordinance of 1787, and was held as a slave from her birth. Aspasia was born after the Ordinance, a slave at Kaskaskia and held as such. The Supreme Court of Missouri held that she was entitled to her freedom, and upon writ of error to the Supreme Court of the United States, that Court declined jurisdiction. After adverting to the rights of the French and Canadian inhabitants in the Illinois country, as a dependent colony of Virginia, to hold slaves; the deed of cession and the possessions, rights and privileges secured by it; to the Ordinance and the State Constitution; and to the twenty fifth section of the Judiciary Act of 1787, giving that Court appellate jurisdiction when a final decision is made against the title, right, privilege, &c. claimed and drawn in question in the construction of any clause of the Constitution, or of any treaty or statute of the United States; they go on to say, that if the decision had been against Aspasia, it might have been contended that the revising power of the Court, under that section, could be exercised, as in such case, the decision would have been against the express provision of the Ordinance in favor of liberty. On that ground, the jurisdiction would be unquestionable, if the Ordinance can be considered as an Act of Congress, within the meaning of the twenty fifth section. As Menard's claim to these services had not its origin under the Ordinance, and the decision was in favor of the rights claimed under it, the Court had no jurisdiction. It is, therefore, strongly deduci-

ble therefrom, that the Court were of opinion that by the Ordinance she became free, and would have taken jurisdiction, had the decision been against her.

· After so many, and such uniformity of judicial determinations upon the meaning, and the application of the Constitution and Ordinance to facts and circumstances like these before the Court, made in so benignant a spirit of humanity and justice, I cannot allow my mind to doubt of the plaintiff's "inherent and indefeasible rights," to become "equally free and independent" with other citizens, "and of enjoying and defending life and liberty and of acquiring, possessing and protecting property and reputation, and of pursuing" his "own happiness," except so far as he may, by the Constitution and laws, be restricted or denied the right of suffrage, &c. All philanthropists unite in deprecating the evils of slavery, and it affords me sincere pleasure, when my duty under the Constitution and laws requires me to break the fetters of the slave, and declare the captive free.

It is said that a legislative, contemporaneous construction, repeated and continued for a great many years, has regarded these negroes as slaves. It is true that the legislature have provided that slaves should be taxed; that they might be sold upon execution, and attachments levied upon them; that they should be enumerated in taking the census, and such like Acts. But none of them declare them to be slaves, and it is only deducible inferentially, because there are no other persons to whom the term will as well or better apply. It is, however, to be remarked, that contemporaneous construction can have no place where the intention is plain. In cases of doubtful construction only is it admissible. But I should never feel warranted in resorting to such a construction, to deprive a human being of his liberty, or deny him the rights of humanity. The presumption is in favor of liberty. *Bailey* v. *Cromwell*, 3 Scam. 73; *Kinney* v. *Cook*, Ib. 232. The law presumes every man to be innocent of crime. The benefit of every doubt is given to the accused, and the presumption allowed to prevail. Should less force and efficacy be allowed the presumption of freedom in rebutting such

doubts, as contemporaneous constructions are admissible to remove? The conviction of a crime may doom the accused to temporary loss of liberty; the solution of a doubt against the plaintiff will doom him to slavery, to bondage for life. If the scales of justice are equally balanced, the law inclines to mercy. If I entertained a doubt I should be compelled to decide in favor of liberty. But as the Courts of Massachusetts and Mississippi declared, so it appears to my mind too plain to admit of construction; "there shall be neither slavery nor involuntary servitude in the said Territory," as declared by the Ordinance; and with a modification as to indentured servants, &c., the Constitution re-iterates that "neither slavery or involuntary servitude shall hereafter be introduced into this State." With the impolicy or injustice of taking away one man's property by a fundamental law in order to restore to another his liberty, in the spirit of humanity, I have nothing further to do, than to ascertain that it is so; and so will leave the question of morality to be settled by the philanthropic, the good, the humane, the just.

The judgment of the Circuit Court will be reversed with cost, and the parties having consented in open Court, judgment will be entered here for the plaintiff, for the sum of five dollars with cost.*

The following separate opinion was delivered by

YOUNG, J. This was an action of *assumpsit* commenced by the plaintiff in error against the defendant in error in the St. Clair Circuit Court, at the April term 1843, for work and labor, and for service performed, but in fact for the purpose of trying his right to freedom. The defendant filed the plea of *non assumpsit*, upon which issue was taken, and seven special pleas, to which there were several demurrers and joinders. At the October term 1843, the Court overruled

---

* This case was argued at the December term 1843, but the Opinion was not delivered until the December term 1844. At the latter term, a petition for a re-hearing was filed and granted, and the cause continued to the present term, when, no one appearing to re-argue the case, the former judgment of this Court was affirmed.

the demurrer to the second special plea, and sustained them as to the residue. Issue was then joined on the second plea. This plea sets up a claim to the services of the plaintiff as a slave by virtue of the laws of the State of Illinois. The cause was then submitted to a jury for trial, who returned a verdict for the defendant. A motion for a new trial was made and overruled by the Court, an exception taken to the opinion of the Court thereon, and a judgment rendered in favor of the defendant for costs.

The following were assigned as the reasons for a new trial, to wit:

1. The verdict is contrary to law; and
2. It is also contrary to evidence.

The following is the evidence given at the trial.

Vital Jarrot testified, that the plaintiff, Joseph Jarrot, had rendered services as the slave or servant of the defendant, Julia Jarrot, for the last five years, and that his services were worth five dollars beyond his clothing and boarding; that Angelique, his grandmother, was held as a slave by one Joseph Trotier at Cahokia, where he resided, in the year 1783; that Louis Lebrun, who married a daughter of the said Joseph Trotier, afterwards held the said Angelique as a slave at Cahokia; that, in the year 1798, Lebrun sold, by bill of sale which was produced and proved, his right to the services of Angelique, and also his right to the services of Pelagie, the daughter of Angelique, then four years old, to Nicholas Jarrot of Cahokia; that the plaintiff, Joseph, was the son of Pelagie, and was born while his mother was held as a slave by the defendant, Julia Jarrot, and was, at that time, twenty five, or twenty six years of age.

Nicholas Boismenue was then called by the defendant, and testified, that he was fifty six years of age, and was born at Cahokia; that he was acquainted in youth with the children and family of Joseph Trotier; that said Trotier was reputed to be an old French settler of Cahokia as early as the year 1769; that he died at Cahokia leaving children and descendants; that Angelique was held by him as a slave, and descended to his son Augustus Trotier; that Nicholas Jarrot,

by his last will and testament, dated February 6, 1818, which was duly proved and recorded, gave and bequeathed all the personal property of which he died seized, to the defendant, Julia Jarrot; that the mother of said plaintiff was held by Nicholas Jarrot as a slave at the time of his decease; and that the plaintiff was born after the death of said Nicholas Jarrot, and while his mother Pelagie was held as a slave by the defendant.

This was all the material evidence given at the trial. The plaintiff objected to the evidence given on the part of the defendant, the Court overruled the objection, and an exception was taken to the opinion. An exception was also taken to the following instruction which was given to the jury at the request of the defendant, to wit: "If the jury believe from the evidence that the plaintiff descended from Pelagie, a woman of color; that Pelagie descended from Angelique, also a woman of color; that Angelique was held as a slave by Joseph Trotier, a French inhabitant in the Illinois country prior to the year 1783, and that said plaintiff has come legally into the possession of the said defendant, that the law is with, and the jury must find for the defendant."

The following are assigned as causes of error in this Court, to wit:

1. The Circuit Court erred in admitting improper evidence to go to the jury on the part of the defendant;

2. The Court instructed the jury contrary to law; and

3. In refusing to sustain the plaintiff's motion for a new trial.

The objection which has been made and urged upon the consideration of this Court by the defendant's counsel, that the plaintiff cannot try the question of his right to freedom in this form of action, we think is not well taken, notwithstanding it has been contended on the authority of the case of *Livingston* v. *Ackeston*, 5 Cowen, 531, that the law will not imply a promise to pay for services, where the person has been purchased and claimed as a servant, whether such claim be legal or not. In that case the facts were, that Ackeston, a black man, worked for Livingston from the spring

Jarrot v. Jarrot.

of 1819 until June 1820, when he sold him to one Benn; that Livingston had bought him from one Ham, as a slave or servant, at $200, and that he was to serve until he was twenty eight years of age; that Ackeston became dissatisfied, and procured Benn to purchase him from Livingston. *Sutherland,* J. said, the defendant purchased him as a slave in perfect good faith, for a large and valuable consideration. The plaintiff Ackeston supposed himself to be a slave, and was sold at his own request by the defendant Livingston to Benn, whom the plaintiff had induced and procured to purchase him. There is no pretence of any express promise on the part of the defendant to pay for his services, and under the circumstances the law cannot raise an implied *assumpsit.* But the Judge remarked in the same case, "that if the services had been performed for the benefit of the defendant, with his knowledge and approbation, that there was no doubt the law would imply a promise to pay for them, unless it appeared that they understood that no compensation was to be made; that, in the case of Ackeston, such was the understanding of the plaintiff, as well as of the defendant; that the plaintiff knew, and admitted that the defendant had purchased his time; that he paid two hundred dollars for it, and was entitled to his services; that he procured another person to purchase the unexpired term of his services from the defendant, and thereby admitted the defendant's right to sell it."

There was no such understanding with the plaintiff and defendant in the case now under consideration. This Court decided at the December term 1840, in the case of *Kinney* v. *Cook*, 2 Scam. 233, and again at the July term 1841, in the case of *Bailey* v. *Cromwell*, 3 do. 71, "that the presumption of law in this State was, that every person was free, without regard to color, and that it was incumbent on the person claiming a right to the services of a colored person to rebut that presumption by proof." The presumption of law, therefore, being in favor of freedom, and no such understanding between the parties being shown, as is mentioned by Justice Sutherland, in the case of *Ackeston* v. *Livingston*, I think that the action of *assumpsit* may be well sustained upon a *quantum meruit* count, if the evidence in the case should

establish the facts, that the plaintiff had been illegally restrained of his liberty, and had performed valuable services for the defendant. I nevertheless believe in a case like the present, where it appears from the evidence that a defendant supposed she had a lawful right to the plaintiff's services as a slave, and acted in good faith towards him, that the Court would be warranted in instructing the jury, if they should find for the plaintiff, to confine their verdict to nominal damages only.

The main question, as presented by the pleadings in the cause, is, whether the descendants of slaves held by the old French settlers in the Illinois country prior to the passage of the Ordinance of Congress for the government of the North Western Territory, on the 13th day of July, 1787, (as contradistinguished from indentured and registered negroes and mulattoes and their descendants under the laws of the Indiana and Illinois Territories,) and born since the date of the said Ordinance, within the limits of this State, can be lawfully held in slavery or not. This question has heretofore been considered, from the course of our legislation upon the subject, both before and since the organization of our State Government; from the long acquiescence in the practice and belief that the " French negroes," as they are usually called, and their descendants, were slaves, and from the various conflicting interests involved in its solution, one of much doubt and perplexity, which neither Legislators or Judges have sought to examine. But being at length presented in a manner, which may not be overlooked or disregarded, I know of no alternative but to follow in the path of duty, however unpleasant, and to decide the question divested of all prejudice, and extraneous circumstances, according to its own substantial and intrinsic merits, and according to the best lights which our own experience, and the adjudications of some of our sister States have shed upon the subject.

The first mention of the introduction of negroes into the country bordering on the Mississippi river as slaves, which I have been able to find, is in Martin's history of Louisiana, p. 225, chap. 9, in which he says, that in the year 1720, two of the Company's ships arrived from the coast of Africa with

Jarrot v. Jarrot.

five hundred negroes; and according to an extract from the ancient French records, which are still preserved among the archives of the State at Kaskaskia, which was read in the argument of this case by one of the counsel for the defendant, it further appears that slavery was expressly authorized in the Province of Louisiana, (of which Illinois at that time constituted a part, so far at least as jurisdiction was concerned,) by an edict of Louis XV., passed in 1723.  Mr. Wirt says, in his argument of the case of *Menard* v. *Aspasia*, 5 Peters, 507, that the French settlements in Illinois were made from Canada, when Canada belonged to France; and that the number of white settlers at that time, exclusive of troops, was about two thousand, and refers for authority to Pittman's History of European settlements on the Mississippi, p. 55; that the settlers brought with them from Canada the French laws and customs, and among them the law by which slavery was tolerated; that this country, as a dependency of Canada, was ceded with Canada to Great Britain by the Treaty of Paris in 1763; that when General Gage took possession of the country in behalf of Great Britain in 1764, he promised by his proclamation to the late subjects of France, then in the Territory, that they should enjoy the same rights and privileges, and the same security for their persons and property, as under their former Sovereign; that at this period, the same laws as those of France prevailed in the colonies of England as to slavery; that at this time there were slaves in this country, and particularly at the posts, of which Kaskaskia was one.   Pittman's History, 43, 47.

In 1778, and during the war of the Revolution, the whole of the country north west of the river Ohio, including the British and French settlements at Post St. Vincents, Kaskaskia and the neighboring villages, was conquered by an expedition fitted out by the State of Virginia, under the command of Col. George Rogers Clarke, by which conquest the limits of that State were extended to the banks of the Mississippi. This whole country was then included within the chartered limits of Virginia, and during the same year was erected into a county of that State, called "Illinois County."   9 Hening's

Virginia Statutes at large, 552, chap. 21. The preamble
to that Act recites, "that the inhabitants had acknowledged
themselves citizens of the Commonwealth of Virginia, and
had taken the oath of fidelity to the State;" and the Act
declared, "that they should enjoy their own religion, with
all their civil rights and property." At this period in our
history, there can be no doubt of the existence of slavery in
Illinois, upon the same footing that it had previously existed,
while the country was under the dominion of France and
England respectively, the rule *partus sequitur ventrem* being
fully recognized and established. The cession of the Terri-
tory North West of the river Ohio was made to the United
States by the State of Virginia, by a deed executed by her
delegates in Congress on the 1st day of March, 1784, which
deed was on the same day accepted by Congress, and order-
ed to be recorded and enrolled among the Acts of the United
States in Congress assembled. This deed of cession con-
tained a clause to the effect following: "That the French
and Canadian inhabitants, and other settlers of the Kaskas-
kies, St. Vincents and the neighboring villages, who have
professed themselves citizens of Virginia shall have their
possessions and titles confirmed to them, and be protected
in the enjoyment of their rights and liberties."

The "Ordinance for the government of the Territory of
the United States North West of the river Ohio," was passed
on the 13th day of July, 1787. The 6th article provides, that
"there shall be neither slavery nor involuntary servitude in
the said Territory, otherwise than in the punishment of crimes,
whereof the party shall have been duly convicted: *provided*
always that any person escaping into the same, from where
labor or service is lawfully claimed in any one of the original
States, such fugitive may be lawfully reclaimed, and convey-
ed to the person claiming his or her labor or service as afore-
said." This Article of the Ordinance, with nine others, were
declared to be articles of compact "between the original
States, and the people and States in the said Territory; and
to remain unalterable forever unless by common consent."

The "*Act to divide the territory of the United States North*

*West of the Ohio into two separate governments,"* was pass-- ed the 7th day of May, 1800. By this Act, the Territory of Indiana was formed, by a line running from a point in the Ohio, opposite the mouth of the Kentucky River to Fort Recovery, and from thence due north to the line between the United States and Canada; and embracing the country west of that line to the Mississippi River. The second sec- tion of this Act of 1800 provides, "that the inhabitants of the Territory shall be entitled to, and enjoy, all and singular the rights, privileges and advantages, granted and received by the said Ordinance of 1787." The same provision was re-enacted in the *"Act for dividing the Indiana Territory into two separate governments,"* by which the Territory of Illinois was created, on the 3rd day of February, 1809. The jurisdiction of Indiana ceased over the Territory of Illinois on the 1st day of March, 1809.

The Act concerning the introduction of negroes and mu- lattoes into the Indiana Territory, by virtue of which, and the provisions of our State Constitution, indentured and reg- istered servants have been held to service in this State, was passed September 17, 1807, and adopted by the Illinois Ter- ritory December 13, 1812. It provides as follows:

" Sec. 1. It shall be lawful for any person being the owner of any negroes or mulattoes of, and above the age of fifteen years, and owing labor and service as slaves in any of the States and Territories of the United States, or for any citi- zen of the said States or Territories purchasing the same, to bring the said negroes and mulattoes into this Territory.

Sec. 2. The owner of any negroes or mulattoes as afore- said, and bringing the same into this Territory, shall within thirty days after such removal, go with the same before the Clerk of the Court of Common Pleas of the proper county, and in the presence of the said clerk, the said owner shall de- termine and agree to and with his negro or mulatto, upon the term of years, which the said negro or mulatto will and shall serve his or her said owner; and the said clerk is hereby au- thorized and required to make a record thereof in a book which he shall keep for that purpose.

Sec. 5. Any person removing into this Territory, and being the owner of any negro or mulatto under the age of fifteen years, it shall and may be lawful for such person, owner or possessor to hold the said negro or mulatto to service or labor, the males until they arrive at the age of thirty five, and the females until they arrive at the age of thirty two years.

Sec. 13. The children born in this Territory of a parent of color, owing service or labor by indenture, according to law, shall serve the master or mistress of such parent, the male until the age of thirty, and the female until the age of twenty eight years."

The provisions of this Act are clearly in violation of the sixth Article of the Ordinance of 1787, and were it not for a saving clause in our State Constitution, all the classes of colored persons embraced by its provisions, and their descendants, would unquestionably be entitled to their freedom.

The Constitution of Illinois, which was approved by Congress on the 3rd day of December, 1818, contains the following provisions:

*First.* "Neither slavery nor involuntary servitude shall hereafter be introduced into this State otherwise than for the punishment of crimes, whereof the party shall have been duly convicted; nor shall any male person arrived at the age of twenty one years, nor female person arrived at the age of eighteen years, be held to serve any person as a servant, under any indenture hereafter made, unless such person shall enter into such indenture while in a state of perfect freedom, and on a condition of a *bona fide* consideration received or to be received for their service. Nor shall any indenture of any negro or mulatto hereafter made and executed out of this State, or if made in this State, where the term of service exceeds one year, be of the least validity, except those given in cases of apprenticeship."

*Second.* "Each and every person bound to service by contract or indenture in virtue of the laws of the Illinois Territory, heretofore existing, and in conformity to the provisions of the same, without fraud or collusion, shall be held to a specific performance of their contracts and indentures;

Jarrot v. Jarrot.

and such negroes and mulattoes as have been registered in conformity with the aforesaid laws, shall serve out the time appointed by said laws; *provided, however,* that the children hereafter born of such persons, negroes or mulattoes, shall become free, the males at the age of twenty one years, the females at the age of eighteen years."

It is by virtue of this latter provision in our Constitution, and by this alone, that this Court decided in the case of *Nance* v. *Howard,* Bre. 187, *Phœbe* v. *Jay,* Ib. 207, *Boon* v. *Juliet,* 1 Scam. 258, *Choisser* v. *Hargrave,* Ib. 318, and *Sarah* v. *Borders,* 4 do. 341, that colored persons could be held to a specific performance of their contracts and indentures under the Act of September 17, 1807, of the Indiana Territory; and that without that constitutional provision, they would be entitled to their freedom, for the reason, that the provisions of that Act were void, as being repugnant to the Ordinance of 1787.

The Act of Congress to enable the people of Illinois to form a Constitution and State government, was passed April 18, 1818, and contains a proviso, that "the same when formed shall be republican, and not repugnant to the Ordinance of July 13, 1787, between the original States and the people and States of the Territory north west of the river Ohio." The Resolution for the admission of the State of Illinois into the Union was passed December 3, 1818. It declares, among other things, "that the Constitution and State Government so formed are republican, and in conformity to the principles of the Articles of Compact between the Original States, and the people and States in the Territory north west of the river Ohio."

From these proceedings, and many other acts of legislation which might be quoted, if necessary, it cannot be questioned, but that the Ordinance of 1787, from the time of its first enactment, became, and has continued to be, an organic regulation for the government of the whole North Western Territory, of which Illinois forms a part, and still remains of binding influence except only in such instances as it may have been repealed or abrogated by the parties to the Compact.

I have said thus much in relation to indentured and regis-
tered servants, for the purpose of showing that their condi-
tion, as to freedom or slavery, is entirely different from that
of the " French negroes," who have been heretofore claimed
absolutely as slaves, as well as their descendants, for an in-
definite period of time.

It cannot be pretended that the Ordinance of 1787, or our
State Constitution, (except by inference, in using the words
" hereafter introduced into this State," &c.) confers upon
the defendant, Julia Jarrot, the right to hold the plaintiff, Jo-
seph, as a slave. But it is insisted, that neither Congress by
the enactment of the Ordinance of 1787, nor the Convention
in the adoption of our State Constitution,. (which makes no
mention whatever of the French negroes,) can take from, or
divest the old French inhabitants, or those claiming under
them, of the right conferred upon them to hold slaves in this
country—*first,* by permission of Louis XV., by an edict pass-
ed in 1723; *secondly,* by the government of Great Britain after
the treaty of Paris of 1763; *thirdly,* by the laws of the State
of Virginia, after the conquest of the country by Col. George
Rogers Clarke, in 1778; and *fourthly,* by the deed of ces-
sion from Virginia to the United States, dated March 1, 1784.

I do not doubt but that the negroes possessed by the old
French settlers at the Kaskaskies, St. Vincents and neigh-
boring villages, during the respective governments of France,
England, and the State of Virginia over the country were
rightfully held as slaves. It was an institution (slavery) cre-
ated and introduced by, and dependent upon the municipal
regulations of each of these particular governments. Al-
though neither England nor France would tolerate the in-
stitution of slavery within their Kingdoms at home, they
did, nevertheless, authorize and encourage its introduction
into their American and West Indian Colonies during the pe-
riods referred to, and for a long time afterwards, as the his-
tory and well authenticated traditions of the early settlers,
so far as this country is concerned, abundantly establish.
But while I admit the actual existence of an authorized slave-
ry within the now limits of this State, at a very early period

Jarrot v. Jarrot.

in our history, I cannot doubt the power of any of these sovereignties, which have had possession of, and exercised, for the time being, a rightful jurisdiction over the country, to have abolished it, whatever may have been said of the injustice or impolicy of such a measure. It is incompatible with the idea of sovereignty that a Kingdom, Government or State, if untrammelled, and unrestrained by fundamental provisions in its form of organization, could not have exercised such a power.

It was proved at the trial in the Court below, that Angelique, the grandmother of the plaintiff, was held as a slave at Cahokia by Joseph Trotier in 1783; that in the year 1798, Lebrun, the son in law of Trotier, sold her to Nicholas Jarrot; that Pelagie, the mother of the plaintiff, was the daughter of Angelique, and was about four years old when her mother was sold to Nicholas Jarrot in 1798; that Nicholas Jarrot made his will on the 6th day of February, 1818, by which he bequeathed Pelagie to Julia Jarrot, the defendant; that Pelagie was held by Nicholas Jarrot as a slave up to the time of his decease; that the plaintiff, Joseph, was born after the death of Nicholas Jarrot, and while his mother, Pelagie, was held as a slave by the defendant; and that the plaintiff, Joseph, has, ever since his birth, continued in the possession of, and has been claimed by the defendant as a slave. The services rendered by the plaintiff to the defendant were proved to be of the value of five dollars. The question now is, were the descendants of Angelique free by virtue of the Ordinance of 1787? It cannot be ascertained from the evidence, whether the plaintiff was born before, or since the adoption of our State Constitution, except from inference; but the more reasonable presumption is,—and I adopt that presumption as the fact,—that he was born since.

It cannot be denied, but that the Ordinance of 1787, in the most express terms, prohibited the future existence of slavery in the Territory; it was enacted as an organic law for the government of the Territory; the representatives from Virginia in Congress took part in its enactment; and the matter to be determined is, whether all prior laws and regula-

tions, which authorize persons of color to be held in slavery, the Virginia Act of Cession inclusive, were not abrogated by the sixth Article of the Compact, which provides, that "there shall be neither slavery nor involuntary servitude in the said Territory, otherwise than in the punishment of crimes, whereof the party shall have been duly convicted." I think that such was the intention of Congress, and this opinion has been very much strengthened by an examination of the Act of Congress of 1789, and another in 1800, by which certain provisions were made to regulate the government of the Territory, and to make a division of it, by creating the Indiana Territory. It is provided in the second section of the Act of 1800, that "the inhabitants of the Territory shall be entitled to, and enjoy, all and singular the rights, privileges, and advantages granted and received by the said Ordinance of 1787." This provision was re-enacted in the Act of Feb. 3, 1809, which established the Illinois Territory. In neither of these is any mention made of any antecedent rights or privileges, either under the Cession Act of Virginia, or any prior law or custom, supposed to be in conflict with the provisions of the Ordinance.

In the case of *John Merry* v. *Tiffin & Menard*, decided by the Supreme Court of Missouri in the year 1827, McGirk, Ch. J. said: "This was an action of assault and battery brought in the St. Louis Circuit Court by John Merry, a man of color, against Tiffin and Menard, to try his right to freedom. The mother of John was a colored woman, and held as a slave in the Territory north west of the River Ohio, before the Ordinance of Congress of 1787; she was holden as a slave in Illinois at the time John was born about thirty six years ago; and he also was holden as a slave until a short time ago. The sixth Article of the Ordinance of 1787 declares, that there shall be neither slavery nor involuntary servitude in said Territory, otherwise than for the punishment of crimes, whereof the party has been duly convicted. The defendants contend, that they are protected in their right to his services as a slave, by virtue of the Cession Act of Virginia, which secured to the ancient settlers in the North

Western Territory, the preservation of their rights and property as citizens of that State. The provisions of the Virginia Act of Cession, we think, is completely satisfied by securing to the then settlers of the country, the rights which they then possessed. John Merry was not then born, and when he was born the law forbid that slavery should exist. According to this view of the subject, we think John is free." 1 Missouri, 725.

In the case of *The State of Indiana* v. *Lasselle*, decided by the Supreme Court of Indiana in 1820, Polly, a woman of color, was brought before the Circuit Court by Lasselle, in obedience to a writ of *habeas corpus*. He stated in his return to the writ, that he held her by purchase as his slave, she being the issue of a colored woman, purchased from the Indians in the Territory north west of the river Ohio, before the Treaty of Greenville, and before the cession of the Territory by Virginia to the United States. The Circuit Court remanded Polly into the custody of Lasselle. Per Scott, J. The question is as to the legality of Lasselle's claim to hold Polly as a slave. It is contended for Polly that by the Ordinance of 1787, and the Constitution of Indiana, which was adop ed in 1816, she is entitled to her freedom. On the part of Lasselle it is insisted, that by the Act of Cession of the State of Virginia, and by the Ordinance of 1787, the privilege of holding slaves was reserved to the settlers at Kaskaskia and St. Vincents, who prior to that time had professed to be citizens of Virginia; and that consequently he had a vested right to her services, which cannot be divested by any provision in the Constitution. That the legislative authority, if uncontrolled by any constitutional provision, could emancipate slaves, will hardly be denied. This has been done in several of the States, and it must be admitted that a Convention chosen to form a Constitution, which is to define, limit and control the powers of the Legislature, as well as the other branches of the government, must possess powers equal, if not paramount to any legislative body. In the eleventh Article of our Constitution, section 7, it is declared, that "there shall be neither slavery nor involuntary servitude in this State otherwise than

for the punishment of crimes, whereof the party shall have been duly convicted." It is evident from this provision, that the framers of our Constitution intended a total and entire prohibition of slavery in this State; and we can conceive of no words in which that intention could have been more clearly expressed. The judgment of the Circuit Court is reversed, and Polly discharged. 1 Blackf. 60.

In the case of *Merry* v. *Chexnaider*, decided by the Supreme Court of Louisiana in 1830, the Court, per Porter, J. said: The plaintiff sues in this action to recover his freedom, and from the evidence on record, is clearly entitled to it. He was born in the North Western Territory, since the enactment by Congress, in 1787, of the Ordinance for the government of that country, according to the sixth Article of which, "there could be neither slavery nor involuntary servitude." This Ordinance fixed forever the character of the population in the region over which it extended, and takes away all foundation from the claim set up in this instance, by the defendant. The Act of Cession by Virginia did not deprive Congress of the power to make such a regulation. The plaintiff accordingly is free. 20 Martin, 699.

In the case of *Harvey* v. *Decker & Hopkins*, decided by the Supreme Court of Mississippi, at the June term 1818, the Court said: The facts in this case are not controverted. The three negroes were slaves in Virginia; in 1784, they were taken by John Decker to the neighborhood of Vincennes; they remained there until July, 1816; the Ordinance of Congress was passed in 1787, and the Constitution of Indiana was adopted on the 29th day of June, 1816. It is contended on the one side, that by the Cession Act of Virginia, these negroes are slaves; and on the other, that by the Ordinance of 1787, and the Constitution of Indiana, they are free. The services of the negroes are claimed as a vested right. What is a vested right? Is it derived from nature, or from the municipal law? Slavery is condemned by reason and the laws of nature. It can only exist through municipal regulations, and in matters of doubt, the Courts must lean *in favorem vitæ et libertatis.* The country formerly belonged to France,

Jarrot *v.* Jarrot.

until by the Treaty of 1763, it was ceded to Great Britain; it will appear by the proclamation of Gen. Gage in 1775, and the acts of Col. Wilkins in granting lands as Governor of Illinois, that it was then a distinct and separate colony from Virginia. During the Revolutionary War it was conquered by the separate arms of Virginia in 1778, and from that time was considered as within the chartered limits of that State. Neither Great Britain, or the State of Virginia, ever changed the French laws and customs then existing in the Province. There is no provision in the Act of Virginia, extending the laws of that State over the conquered Province. It is undeniable, then, that the laws as they existed while it was a Province of France, were the municipal laws of the country. The Virginia Act of Cession provides " that the French and Canadian inhabitants and other settlers professing themselves citizens of Virginia, shall have their possessions and titles confirmed, and be protected in the enjoyment of their rights and privileges;" and, we find, that until the Governor and Judges should adopt laws; the manner of passing and transferring estates, declared; by saving to the French and Canadian inhabitants and other settlers of Kaskaskia and Vincennes, and the other villages, the laws and customs in force among them relative to the descent and conveyance of property. If the laws of Virginia were extended over them, this saving clause would have been unnecessary. The conclusion to which the Court came, after a long and able process of reasoning, was, that the Treaty of Cession by Virginia to the United States, which guaranties to the inhabitants of the North Western Territory, their titles, rights and liberties, does not render void that Article of the Ordinance of Congress of 1787, which prohibits slavery in that Territory; that any State may, by its Constitution, prohibit slavery within its limits, when not restrained by the Constitution of the United States; and that slaves within the limits of the North Western Territory became freemen by virtue of the Ordinance of 1787, and can assert their claims to freedom in the Courts of the State of Mississippi. Walker's Miss. R. 36.

In the case of *Aspasia* v. *Menard*, decided by the Supreme Court of Missouri, an action of assault and battery was instituted in the Circuit Court of St. Louis County by Aspasia, a woman of color, to establish her freedom. It appeared from the evidence, that the mother of Aspasia was born a slave, and as such held by a French inhabitant of Kaskaskia, Illinois, previous to the year 1787, and before the passage of the Ordinance for the government of the North Western Territory; that Aspasia was born after the year 1787, and from the time of her birth was raised and held as a slave until the year 1821, when she was purchased by Pierre Menard, the defendant, and given to his son in law, Francis Choteau, of St. Louis, who held her as a slave until the 10th day of October, 1827, at which time he returned her to Menard, in consequence of the claim she set up to her freedom. The counsel for Menard on the trial below moved the Court to decide, " that if it was found from the testimony that the mother of Aspasia was a negro woman, legally held in slavery, before the adoption of the Ordinance of 1787, by a French inhabitant of Kaskaskia, who was a citizen of the country before its conquest by Virginia, and that the plaintiff, Aspasia, was born at Kaskaskia of such mother, while so held in slavery by such French inhabitant, although subsequent to the date of the Ordinance, that she is not entitled to her freedom." This instruction the Court refused to give, but decided that Menard, the defendant, was guilty, and that Aspasia, the plaintiff, was not a slave, but free. The Supreme Court of Missouri affirmed this decision.

A writ of error was afterwards prosecuted to the Supreme Court of the United States in the foregoing case, but was dismissed for want of jurisdiction. McLean, J. who delivered the Opinion of the Court dismissing the writ of error, intimates very strongly what the decision of that Court would be, if a proper case were made before it, in summing up his remarks as follows:  " Whatever right may be claimed to have originated under the Ordinance of 1787, it would seem that the right to the involuntary service of an individual could not have had its source in that instrument. It declares that

'there shall be neither slavery nor involuntary servitude in the territory.'" If this did not destroy a vested right in slaves, it at least did not create or strengthen that right. *Menard* v. *Aspasia*, 5 Peters, 510.

Many other cases might be cited, tending to establish the same doctrine, as to the effect of the Ordinance of 1787 over all preceding regulations in relation to the institution of slavery in the NorthWestern Territory, and in the States formed out of it; while not a solitary case has been found, after the most laborious search, where it has been determined that the Act of Cession by Virginia to the United States had any controlling influence, as authority, upon this subject, since the passage of the Ordinance of 1787, as an organic law for the government of the Territory.

Does our State Constitution by inference, recognize and perpetuate, as a vested right, or otherwise, the claim of the defendant, Julia Jarrot, to the plaintiff, Joseph, as a slave?

So far from it, I think that the Constitution appears an additional barrier to her claim. The fair construction of the clause in our Constitution, which provides that "neither slavery nor involuntary servitude shall hereafter be introduced into this State," is, that inasmuch as slaves were allowed to be introduced into the Territory by the Act of the Indiana Territory in 1807, which had been adopted as a law of the Illinois Territory in 1812, for the purpose of securing their services to their owners for a limited time, as servants by indenture and registry; and as some of our citizens, engaged in the salt making business, had also been in the habit of hiring slaves from their owners in some of the neighboring States, at the Ohio Saline near Shawneetown, that the privilege of bringing them into the country for such purposes should cease and be determined, cotemporaneous with the admission of the State into the Union, with the exception that they might be hired at the salt work, until the end of the year 1825.

It was evidently intended by the framers of our Constitution that this should be a free State, and yet it is contended for the defendant, that the French negroes and their descend-

ants, though resident in this State, are slaves forever! As
to the power of a State to emancipate the slaves of its citi-
zens, there can be no reasonable doubt. That power has
been exercised too often, and acquiesced in too long to admit
of question at this late day. The States of Pennsylvania,
Delaware, New Jersey, New York, and all the New England
States except Massachusetts, have legislated upon this sub-
ject; and that it is a proper subject for legislative interfer-
ence, when not restrained by the Constitution of the United
States, and of the particular State in question, is now an in-
controvertible proposition which requires no argument to
defend it.

After so many, and such uniformity of judicial adjudica-
tions upon the meaning, construction, and application of the
Virginia Act of Cession, the Ordinance of 1787, and our own
State Constitution, we cannot resist the conclusion, that all
persons of color, who were in this country before and since
the passage of the Ordinance of 1787, and their descendants,
usually known by the appellation of " French negroes," are
free.

We have before remarked, that the legal presumption in
this State is in favor of freedom. The *onus probandi* was,
therefore, upon the defendant, and after the plaintiff had
proved the performance of services for the defendant, and
their value, it was incumbent upon the defendant to have
established her claim to those services, by showing that the
plaintiff was her slave. This she has failed to do, and the
consequence is, that the plaintiff, Joseph, is entitled to his
freedom.

I have before remarked, that in all cases like the present,
where the suit, though in form is an ordinary action of *as-
sumpsit* for work and labor and services performed, is insti-
tuted nevertheless for the purpose of trying the plaintiff's
right to his freedom, as is apparent from the pleadings and
evidence, as well as from the arguments of counsel in the
cause; and where it is equally apparent that the defendant
acted in good faith towards the plaintiff, and had reasonable
ground to believe that the plaintiff was her slave, that in the

result of a verdict against her, nominal damages only ought to be given. This opinion, I find on examination, is support-ed by the current of authorities on that subject, and ought to be adopted as the just and equitable rule in this and all similar cases. *Phillips* v. *Gentin*, 9 Louisiana, 268; *Plea-sants* v. *Pleasants*, 2 Call, 360; *Thompson* v. *Wilmot*, 1 Bibb, 422.

That Illinois was intended to be a free State, and that slavery is prohibited by our Constitution, is also apparent, if further illustration is necessary, from the Resolution of Congress admitting this State into the Union in 1818, which declares, that " the Constitution and State government so formed are republican, and in conformity to the principles of the Articles of Compact between the original States, and the people and States north west of the river Ohio." And that Compact declares, that "there shall be neither slavery nor involuntary servitude in the Territory, otherwise than in the punishment of crimes, whereof the party shall have been duly convicted."

If the plaintiff was born since the adoption of our Consti-tution, which is presumed to be the fact from the evidence, that instrument, also, as well as the Ordinance of 1787, would entitle him to his freedom, as there is no saving clause in relation to the French negroes and their descendants, as in the instance of indentured and registered negroes and their children.

The decisions of this Court, therefore, which have been made in relation to this latter class of persons are not appli-cable to the former. As to the binding effect of the Ordi-nance of 1787 in this State, since the adoption of our Consti-tution, this Court said, in the case of *Phœbe* v. *Jay*, Bre. 110: " The Ordinance of 1787 is binding upon the people of the State of Illinois, unless abrogated by common consent. By common consent is meant the United States and the peo-ple of the State of Illinois. Whenever they shall agree that the Ordinance shall be repealed, it will, as to the State of Illinois, cease to have any effect. The people of this State, by recognizing the validity of the indentures and registries of colored persons made under the Act of 1807, by the pro-

vision of the State Constitution, *pro tanto*, gave their consent to alter so much of the sixth Article of 1787 as was repugnant to our Constitution; and Congress, by their Resolution of 1818, admitting our State into the Union, gave their assent also."

WILSON, C. J. The fact that the plaintiff was born after the adoption of the Constitution is fairly inferable from the case, and upon that ground, I concur in the judgment of the Court. But I am not prepared to say, that if the plaintiff was a slave before the adoption of the Constitution, that he could now assert his liberty.

CATON, J. I am of opinion that the judgment of the Court below should be reversed.

Justices SHIELDS, TREAT and THOMAS dissent from the Opinion of the Court.

*Judgment reversed.*